1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT
                               WESTERN DISTRICT OF WASHINGTON
9                                        AT SEATTLE

10   J.H. and D.H., parents of P.H., a minor,        CASE NO. 2:23-cv-191 MJP

11                     Plaintiffs,                    ORDER ON CROSS-MOTIONS
                                                     FOR SUMMARY JUDGMENT
12          v.

13   SEATTLE PUBLIC SCHOOLS,

14                     Defendant.

15

16          This matter comes before the Court on the Parties' Cross-Motions for Summary

17   Judgment. (Dkt. Nos. 16, 17.) Having reviewed the opening Briefs (Dkt. Nos. 16, 17), the

18   Response/Reply Briefs (Dkt. Nos. 18, 19), the Administrative Record (Dkt. Nos. 12, 13), and all

19   supporting materials, the Court GRANTS Defendant Seattle Public Schools' Motion and

20   counterclaim and DENIES Plaintiffs' Motion and claim for attorneys' fees.

21                                        **BACKGROUND**

22          This is an appeal of an administrative law judge's ("ALJ") determination that Defendant

23   Seattle Public Schools ("the District") denied P.H., Plaintiffs' autistic child with free and

24

1    appropriate education ("FAPE") as required by the Individuals with Disabilities Education Act

2    ("IDEA") when the District did not place P.H. in his least restrictive environment at the end of

3    the 2021-2022 school year. While Parents seek an award of attorneys' fees for having prevailed

4    before the ALJ, the District appealed the ALJ's decision and asks for reversal. (See Compl. (Dkt.

5    No. 1); Answer and Counterclaim (Dkt. No. 8).) To understand the Parties' arguments and the

6    legal issues, the Court reviews the salient facts from Administrative Record concerning P.H.'s

7    education and the procedural history of this action.

8    **A.    Factual Background**

9        P.H. is a student with Autism Spectrum Disorder who began attending kindergarten in the

10    District in 2017, with special education services provided pursuant to an individualized

11    education plan ("IEP"). (ALJ Findings of Fact ("ALJ") ¶¶ 1-3 (Administrative Record ("AR") at

12    2703); AR 2854.) To identify behaviors that interfered with his learning and provide

13    recommendations to reduce or replace them, the IEP team performed functional behavior

14    assessments ("FBAs") and developed behavior intervention plans ("BIPs") in April 2018 and

15    March 2019. (AR 2858.) P.H.'s family also worked with private providers to deliver applied

16    behavioral analysis ("ABA") therapy for P.H, which included a behavioral technician ("BT") to

17    work with P.H., and accompany P.H. to school to act as one-on-one support during the day. (ALJ

18    ¶ 6 (AR 2704).) This appeared to work well for P.H., and in January 2020, the IEP team

19    determined P.H. no longer needed an FBA or BIP. (ALJ ¶¶ 7-8 (AR 2704-05).) And prior to the

20    closure of in-person school due to the COVID-19 pandemic in March 2020, P.H had been

21    "attend[ing] school regularly and seemed to enjoy it, according to his Parents." (ALJ ¶ 10 (AR

22    2705).)

23

24

1    The COVID-19 pandemic and remote schooling caused P.H. to regress, and his return to

2    partial in-person instruction in March 2021 was not particularly easy. (See ALJ ¶¶ 17-32, 42.) By

3    March 2021, P.H. attended school in person two-and-a-half hours a day and four days a week,

4    during which P.H. began exhibiting aggressive behavior. (ALJ ¶¶ 42, 45 (AR 2714).) On May

5    17, 2021, Parents requested an FBA to be conducted and a BIP to be developed due to P.H.'s

6    continued aggression. (ALJ ¶ 48 (AR 2715).) But by the end of the school year, no FBA or BIP

7    had been completed. Over the summer break, P.H. attended a "behavior-based summer camp"

8    (referred to as "SCC") that proved quite successful for P.H. (ALJ ¶¶ 51, 56 (AR 2715-16).) P.H.

9    returned to school on October 4, 2021, after transitioning from his extended participation at SCC.

10   (ALJ ¶ 68; AR 4145, 4156.) And on October 9, 2021, the District presented its proposed FBA

11   and BIP to Parents, who accepted them. (ALJ ¶ 68 (AR 2719).)

12   Upon his return to school for the 2021-2022 school year, P.H.'s behavior became

13   problematic, with frequent occurrences of aggressive behaviors. (AR ¶ 71 (AR 2719).)

14   Beginning in November 2021, P.H. also began complaining about going to school and refusing

15   to get on the bus. (ALJ ¶ 72 (AR 2719).) Several times he refused to get on the bus and his

16   mother ended up driving him to school. (Id.) On November 12, 2021 the IEP team met with

17   Parents and added a one-on-one BT, a bus monitor, and a one-on-one instructional assistant to

18   P.H.'s IEP. (ALJ ¶¶ 73-74 (AR 2720).) The bus monitor was sought due to safety concerns

19   regarding P.H.'s behavior on the bus ride to and from school. (AR 4187.) The bus monitor was

20   not sought in response to school-refusal concerns, of which the District appears to have been

21   unaware at this time. (Id.) But the District was unable to hire anyone for the bus monitor

22   position, so it could not provide that service to P.H. (ALJ ¶ 75 (AR 2721).) Separately, around

23

24

this same time in November 2021, a clinical psychologist working with Parents discussed

residential placement for P.H. and suggested two facilities. (AR 4191.)

P.H.'s aggressive behaviors escalated in the Fall and Winter of 2021. At the end of

November, P.H.'s outside providers determined they could not serve P.H. safely due to his

aggressive behaviors and stopped working with him in early December 2021. (AR 4501; ALJ ¶

79 (AR 2721).) P.H.'s behaviors continued to escalate in December. (ALJ ¶ 80 (AR 2722).) P.H.

masturbated in the classroom on one occasion requiring other students to be cleared of the room,

he continued to engage in aggressive assaultive behaviors, and had to be place in physical holds

three times due to aggression. (Id.) P.H. also continued to refuse to go to school periodically in

December, but would eventually agree if his mother or one of her friends drove him. (ALJ ¶ 82

(AR 2722).) P.H.'s mother informed the District of these occurrences. (Id.) P.H. refused to go to

school on January 4, 2022, following winter break, but then attended all other school days in

January. (ALJ ¶¶ 83-84 (AR 2722).) The assaultive behavior continued, and District staff

members had to place P.H. in physical holds at least three times in January. (ALJ ¶ 84 (AR

2722).)

The District held an annual IEP meeting with Parents on February 3, 2022. (ALJ ¶ 85

(AR 2722).) P.H.'s goals were extensively discussed, as was the revised BIP. (ALJ ¶¶ 85-86 (AR

2722-23).) The revised BIP targeted only one behavior—physical escalation—and included two

pages of intervention strategies that were almost identical to the October 2021 BIP, despite the

increase in physical escalations. (ALJ ¶ 87 (AR 2723).) At this time, Parents were seeking

residential placement for P.H., but had not informed the District. (ALJ ¶ 89 (AR 2723).)

By March 2022, P.H.'s school-refusal behaviors began to increase. By March 1, 2022,

P.H.'s mother emailed the District to inform the District P.H. had become "dangerously

aggressive" when Parents attempted to get him on the bus. (ALJ ¶ 91 (AR 2724).) P.H.'s mother requested an emergency IEP meeting to discuss the issue. (Id.) The District held an IEP meeting on March 4, 2022, to discuss P.H.'s school-refusal behavior. (ALJ ¶ 92 (AR 2724); AR 4250).) The IEP developed at the meeting provided for increased BT and Board Certified Behavior Analyst ("BCBA") support during the day and in the mornings at home to support P.H. with school refusal behaviors, as well as direct BCBA services. (ALJ ¶ 94 (AR 2725-26).) The District also offered to try different transportation for P.H., easing back to school using SCC, having a BT from SCC assist at home in the morning before school, and having an ABA agency assist the family. (AR 4250.) The District also recommended starting a new FBA and BIP to address the school-refusal behavior. (Id.) The Parties dispute whether Parents accepted or rejected these offers. But following the meeting, the IEP team moved forward with a BT going to the home in the mornings. (ALJ ¶ 99.)

P.H.'s school refusal behavior continued to escalate from March through May, 2022. P.H. refused to attend school March 10, 11, 14-18, and 21-25, 2022, and he would become physically assaultive if his parents tried to get him out of bed to attend school. (ALJ ¶¶ 102-04 (AR 2727-28).) On March 22, 2022, Parents' attorney notified the District of Parents' intent to place P.H. in private residential placement and seek reimbursement from the District if the District did not offer an IEP reasonably calculated to provide P.H. with educational benefit within the next ten days. (ALJ ¶ 105 (AR 2728).) The IEP team met on March 24, 2022, and discussed Parents' request for residential placement. (ALJ ¶ 107 (AR 2728).) The District rejected Parents' request because it believed it could serve P.H through an amended IEP at the District, with provision of additional BT/BCBA support. (Id.) Parents objected to the proposed amended IEP because it did not provide for residential placement. (ALJ ¶ 110 (AR 2729).) But P.H.'s father signed a consent

form on March 28, 2022 to allow the District to conduct another FBA pursuant to the IEP. (ALJ ¶ 112 (AR 2730).) On March 29, 2022, Kevin Bascom, a BCBA with Brooks Powers Group, began preparing an FBA to examine P.H.'s school-refusal behaviors. (ALJ ¶ 113 (AR 2730).) Meanwhile, P.H. refused to attend school for the entire month of April 2022, attended school on May 4-6, 2022, but then refused to attend until May 31, 2022. (ALJ ¶¶ 116, 118 (AR 2731).)

On May 13, 2022, the District shared the FBA and BIP with Parents with the intention of targeting both physical aggression and school refusal. (ALJ ¶ 119 (AR 2731); AR 4338-44.) The physical aggression and intervention plan appears to have been carried over from the fall, but the school refusal section lists various intervention strategies to shape re-engagement with P.H. (AR 4341-44.) Specifically, Bascom developed interventions to include functional communication, gradual reinforcement of steps towards the desired behavior, which included a "shaping procedure" in which steps towards the goal of school attendance were gradually reenforced. (ALJ ¶ 121 (AR 2732).) The FBA also proposed reducing demands and providing a choice of activities to P.H. when he did attend school. (Id.) Only small steps were expected at first, and P.H. would receive a predetermined award for completing each step. (Id.) The BIP reflected the FBA's plan, and was implemented on May 25, 2022. (ALJ ¶ 124 (2732-33).) Parents felt the FBA minimized the scope, longevity, and severity of P.H.'s behaviors. (ALJ ¶ 125 (AR 2733).) Parents' clinical psychologist agreed with Parents and felt the strategies set forth in the BIP had already been tried unsuccessfully. (Id.)

During the brief time after the BIP was implemented on May 25, 2022 before the end of the school year in mid-June, P.H. had a mixed attendance record. From May 24-27, 2022, P.H. threw tantrums and escalated behaviors when told he had to get dressed for school, and despite getting dressed and receiving his predetermined award, P.H. still refused to go to school. (AR

2733 (ALJ ¶¶ 126-28).) From May 31-June 3, P.H. got dressed and attended school without needing any reinforcement—for reasons unknown to Parents. (ALJ ¶ 128 (AR 2733-34).) Bascom felt this was an indication P.H. could still go to school and that P.H.'s reasons for avoiding school could potentially be overcome. (Id.) P.H. refused to go to school for the remainder of the school year. (ALJ ¶ 129 (AR 2734).)

On June 7, 2022, Parents informed the District of their intention to unilaterally place P.H. at Shrub Oak International School, a private school for individuals with Autism, in New York at the beginning of the summer. (ALJ ¶ 132 (AR 2734).) P.H. began to attend Shrub Oak on July 1, 2022, and was reportedly doing well as of September 2022. (ALJ ¶ 141.) Annual tuition at Shrub Oak is $533,695. (AR 3884.)

**B.    Procedural History**

Parents filed a due process complaint with the Office of Administrative Hearings on April 28, 2022, alleging the District violated the IDEA by failing to provide a variety of accommodations and adequate IEPs. (AR 2699-2702.) Parents also sought approval of and compensation for their unilateral placement of P.H. in a private residential school. (Id.) After holding a nine day hearing in October 2022, the ALJ issued her Findings of Fact, Conclusions of Law, and Order on January 12, 2023. (AR 2697-2782.)

The ALJ concluded the District violated the IDEA on four grounds: (1) the District failed to implement P.H.'s January 2020 IEP (AR 2761-62); (2) the BIP in place as of February 2022 was inappropriate (AR 2767-68); (3) the 2022 May FBA and BIP were inappropriate (AR 2768-69); and (4) the District failed to implement P.H.'s March 2021 IEP (AR 2763-64). The ALJ found the March 2022 IEP was appropriate as to P.H.'s placement when developed, but that the

1  FBA and BIP were inappropriate because they did not include recommendations sufficient to

2  deal with P.H.'s behavioral issues and therefore constituted a denial of a FAPE. (AR 2768-72.)

3       The ALJ found the District violated the IDEA by failing to provide FAPE in the least

4  restrictive environment to P.H. prior to his enrollment at Shrub Oak. (ALJ Conclusions of Law

5  ("ALJ Concl.") ¶ 80 (AR 2776).) She concluded that P.H.'s unilateral placement at Shrub Oak

6  was appropriate because it was reasonably calculated at the time of enrollment to meet P.H's

7  needs. (ALJ Concl. ¶¶ 81-82 (AR 2776-77).) The ALJ found the equities weighed in the favor of

8  an award of past and future tuition reimbursement, and past and future travel expenses incurred

9  by Parents and P.H. (ALJ Concl. ¶¶ 89-90 & ALJ Order ¶¶ 3-8 (AR 2778-81).)

10       Parents filed this action to obtain attorneys' fees incurred in the administrative

11  proceeding. (See Compl.) Through its counterclaim, the District appeals the ALJ's findings and

12  conclusions on the following issues: (1) whether the FBA dated on or about March 29, 2022

13  inappropriately focused on school refusal, ignored and failed to include input from P.H.'s third-

14  party providers, failed to consider or identify elements of residential placement as a necessary

15  component of the BIP, and was untimely; (2) whether the District's proposed IEP and BIP at the

16  time hearing were inappropriate and not reasonably calculated to provide educational because:

17  (a) the April 23, 2022 BIP focused too heavily on school refusal, omitted key insights of third-

18  party providers, relied on insufficient data, failed to identify residential placement; and (b) the

19  March 4, 2022 IEP failed to provide the Student with residential placement, which the ALJ

20  found to be the least restrictive environment necessary for FAPE; (3) whether Parents' requested

21  placement for a private residential school was appropriate; and (4) whether Parents are entitled to

22  any remedies set forth in the IDEA. (See ALJ Summary of Issues at AR 2700-02.)

23

24

# ANALYSIS

**A.    Legal Standard**

Under the IDEA, the district court is to "receive the records of the administrative proceedings;" "hear additional evidence at the request of a party;" and "grant such relief as the court determines is appropriate" based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B). The burden of proof is on the party challenging the administrative ruling. Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996). The Court does not perform a de novo review. Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993). Rather, the Court gives "due weight . . . to these proceedings" and may not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).

"How much deference to give state educational agencies . . . is a matter for the discretion of the courts." Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987) (emphasis in original); see Ojai, 4 F.3d at 1471 (noting that traditional agency deference does not apply). The court must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. Capistrano Unified School Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995). The Court is not permitted to simply ignore the administrative findings. Gregory K., 811 F.2d at 1311. But after a careful consideration of the hearing officer's decision, the court is free to accept or reject the findings in whole or in part. Id.

**B.    IDEA Standard**

The IDEA was created to "ensure that all children with disabilities have available to them a free and appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education,

1    employment and independent living." 20 U.S.C. § 1400(d)(1)(A). A FAPE entails special

2    education and related services be: (1) provided at public expense, under public supervision and

3    direction, and without charge; (2) meeting the standards of the State educational agency; (3)

4    including an appropriate preschool, elementary, or secondary school education; and (4) provided

5    in conformity with an IEP. 20 U.S.C. § 1401(9). To provide a FAPE, a state educational agency

6    must evaluate a student, determine eligibility, conduct and implement an IEP, and determine an

7    appropriate educational placement. J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F. 3d

8    431, 432 (9th Cir. 2010) (citing 20 U.S.C. § 1414).

9           IDEA compliance entails both procedural and substantive components. M.L. v. Fed. Way

10   Sch. Dist., 394 F.3d 634, 644 (9th Cir. 2005) (citing Rowley, 458 U.S. 206–07). And parents

11   may challenge the school district's procedural and/or substantive compliance with the IDEA. See

12   N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1207 (9th Cir. 2008). The Rowley Court

13   established a two-part test to determine whether a state has provided FAPE. 458 U.S. at 206–07.

14   "First, has the State complied with the procedures set forth in the Act?" Id. at 206 (footnote

15   omitted). "And second, is the individualized educational program developed through the Act's

16   procedures reasonably calculated to enable the child to receive educational benefits?" Id. at 206-

17   07 (footnote omitted). "If these requirements are met, the State has complied with the obligations

18   imposed by Congress and the courts can require no more." Id. at 207. An appropriate public

19   education under the IDEA does not "mean the absolute best or 'potentially maximizing'

20   education for the individual child." Gregory K., 811 F.2d at 1314 (internal citation omitted). A

21   school district must provide "a basic floor of opportunity through a program individually

22   designed to provide educational benefit to the child." Id. (internal citation and quotation

23   omitted.)

24

1    Though the ALJ made conclusions about the District's procedural and substantive

2    compliance with the IDEA, the District only appeals the ALJ's conclusions as to substantive

3    compliance. And because the District filed the counterclaim, it bears the burden to demonstrate

4    the ALJ's decision should be reversed. J.W., 626 F.3d at 438.

5    **C.    The Court's Level of Deference**

6        The District argues the ALJ's decision contained numerous errors and lacked

7    impartiality, and therefore the Court should not give deference to her decision. (District Brief at

8    19.) The Court agrees with the District only in part.

9        The Court gives deference to an ALJ's decision "when it evinces his or her careful,

10    impartial consideration of all the evidence and demonstrates his or her sensitivity to the

11    complexity of the issues presented." J.W., 626 F.3d at 440. As the Ninth Circuit has explained, a

12    court "treat[s] a hearing officer's findings as 'thorough and careful' when the officer participates

13    in the questioning of witnesses and writes a decision contain[ing] a complete factual background

14    as well as a discrete analysis supporting the ultimate conclusions." R.B. v. Napa Valley Unified

15    Sch. Dist., 496 F.3d 932, 942-43 (9th Cir. 2007). And "credibility-based findings [of the ALJ]

16    deserve deference unless non-testimonial, extrinsic evidence in the record would justify a

17    contrary conclusion or unless the record read in its entirety would compel a contrary

18    conclusion." Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877, 889 (9th Cir.

19    2001).

20        The District argues the ALJ made several factual errors and demonstrated a lack of

21    impartiality by improperly assigning Parents' testimony and the testimony of the Parents'

22    witnesses with more weight than the testimony of the District's witnesses. Given Ninth Circuit

23    case law regarding deference and ALJ's participation in the underlying proceedings, the Court

24

1   affords deference to the ALJ's witness credibility determinations. But the Court agrees with the

2   District that the ALJ made several factual errors. The Court does not afford deference to these

3   erroneous factual findings, as explained in detail below.

4   **D.**    **The May 2022 FBA and BIP Were Appropriate**

5        The District argues the ALJ erred in concluding the May 2022 FBA and BIP were

6   inappropriate. The Court agrees.

7        To orient this issue, the Court first reviews some basics concerning IEPs, FBAs, and

8   BIPs. An IEP is a written statement, produced annually by a local education agency and designed

9   in conjunction with a disabled child's parents, teachers, and other relevant parties. Ojai, 4 F.3d at

10   1469. The IEP must contain statements of the child's performance, measurable goals, criteria for

11   measuring progress, services, aids, modifications, and supports to be provided, an explanation of

12   the extent a child will not participate with nondisabled children in class or other activities,

13   accommodations necessary to measure achievement and performance, and details regarding the

14   timing, frequency, location, and duration of services and modifications. 20 U.S.C. §

15   1414(d)(1)(A)(i). And as is relevant to this case, FBAs and BIPs are tools used by IEP teams to

16   address behavioral issues that interfere with a student's access to education and may be used and

17   incorporated into a student's IEP. See 20 U.S.C. § 1414(k)(1)(D). The adequacy of an IEP is

18   evaluated in light of information available to the IEP team at the time it was developed; it is not

19   judged exclusively in hindsight. Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999)

20   ("An IEP is a snapshot, not a retrospective.") (citation omitted). The key is whether the program,

21   at the time it was drafted, was appropriately designed and implemented so as to convey the

22   student a "meaningful benefit." Id.

23

24

1      The Court finds the ALJ erred in determining the 2022 FBA and BIP were inappropriate.

2  Applying the "snapshot rule," the ALJ concluded the FBA and BIP were inappropriate at the

3  time they were developed because the recommendations were insufficient to deal with P.H.'s

4  behaviors and did not identify new interventions. (ALJ ¶ 53 (AR 2769).) The ALJ also

5  concluded the BIP was unlikely to work, describing it as "failing abysmally." (ALJ ¶ 55 (AR

6  2769).) There are two problems with these conclusions.

7      First, the ALJ erroneously found the District's expert admitted the BIP was unlikely to be

8  effective. (ALJ ¶ 54 (AR 2769).) The District's expert provided no such testimony. Instead, the

9  expert opined that the intervention methods met best practices for school refusal, and that

10  although implementation of the BIP was promising, there was insufficient time before the end of

11  the school year to determine whether the interventions would be effective. (AR 1897-98; 1901-

12  02.) Indeed, Parents' expert also noted the BIPs from October 2021 to May 2022 "included

13  strategies and interventions approaches that were well thought out, based on best practices in the

14  field of behavior analysis, and explained in such a way that most paraprofessionals and direct

15  care staff would understand." (AR 4984.) The ALJ's erroneous finding regarding this issue

16  undermines her conclusion that the FBA and BIP were inappropriate.

17      Second, the ALJ failed to consider the lack of sufficient time after implementation to

18  determine whether the FBA and BIP were adequate. In support of her finding the BIP was

19  "failing abysmally," the ALJ incorrectly suggested the BIP had been in place since April and that

20  there was no data collected for April, May, or June. (See ALJ ¶ 54 (AR 2769) (erroneously

21  referring to the BIP to it as the "April 2022" BIP); ALJ ¶ 55 (AR 2769).) The BIP was not

22  implemented until May 25, 2022—sixteen school days before the end of the school year during

23

24

which P.H. attended school for just four days. (ALJ ¶¶ 124, 128-29).) (AR 2732-34); Parents'

Opp. at 25; District Opening Br. at 39.)

The Court finds the ALJ erred in finding the BIP and FBA were inadequate. Given the

limited period of time the BIP had been in place, there was inadequate data to confirm whether

the FBA and BIP were failing or inadequate. And the fact that P.H. did not attend school each

day during this period is not evidence the plans were failing. The ALJ's finding the BIP was

"failing abysmally" is unsupported in the record, and the Court rejects the conclusion.

Additionally, as both the District and Parents' experts opined, the BIP itself met best practices.

Critically, the goal of the BIP was not for P.H. to attend school on the first day, but to reinforce

steps towards school reengagement given that immediate reattendance was too great a goal. (ALJ

¶ 124.) There is evidence in the record that P.H. was making such steps in the limited window

during which the BIP was in place. Based on the record before the ALJ, the Court finds that the

BIP and FBA were appropriately drafted, as both Parents and District's experts agree, and that

there was insufficient time after implementation to determine whether they were adequate or

sufficient to provide FAPE. The Court GRANTS the District's appeal as to this issue and

REVERSES the ALJ's conclusion.

**E.    May 2022 FBA and BIP Did Not Constitute a Denial of FAPE**

The Court also finds the ALJ erroneously concluded the May 2022 FBA and BIP

constituted a denial of FAPE. (ALJ Concl. ¶ 80 (AR 2776).)

To have received a FAPE, the IEP must have "(1) addresse[d] [P.H.'s] unique needs, (2)

provide[d] adequate support services so [P.H.] can take advantage of the educational

opportunities, and (3) [been] in accord with the individualized education program." Capistrano,

59 F.3d at 893 (internal citation omitted). The IDEA only requires an FBA when a child is

1    removed from his current placement due to problem behaviors. 20 U.S.C. § 1415(k)(1)(D)(ii).

2    For other students with disability-related behavioral needs, an IEP need only include (1)

3    "measurable annual goals" developed to "enable the child to be involved in and make progress in

4    the general education curriculum;" and (2) how "progress toward meeting the annual goals . . .

5    will be measured." 34 C.F.R. § 300.320(a)(2)(i),(3)(i). The concern is whether the IEP and its

6    underlying behavioral analysis is reasonable, not whether it was ideal. Endrew F. ex rel. Joseph

7    F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399-400 (2017).

8           The ALJ erred in concluding the May 2022 FBA and BIP denied P.H. FAPE. The Court

9    first notes the ALJ concluded the March 2022 IEP—the last IEP to be developed—was

10   appropriate at the time it was developed. (ALJ ¶ 64 (AR 2772).) This is a critical finding. But the

11   ALJ then concluded the May 2022 FBA and BIP conducted in furtherance of the IEP, were

12   inappropriate and resulted in the denial of a FAPE. (ALJ ¶ 54 (AR 2769).) This conclusion was

13   erroneous, because the ALJ was required to assess the adequacy of the IEP as a whole, not the

14   FBA and BIP, to determine whether the IEP satisfied the provision of FAPE. Rowley, 458 U.S.

15   at 188-89 (noting that a child receives a FAPE if, along with the other two factors, the program is

16   in accord with the IEP). Moreover, the ALJ wrongly determined that an FBA and/or BIP

17   themselves constituted a denial of FAPE. Inadequate or omitted FBAs and BIPs are generally

18   considered procedural violations of the IDEA only that do not necessarily rise to the level of

19   denial of FAPE. See R.E. v. New York City Dept. of Educ., 694 F.3d 167, 190 (2d Cir. 2012);

20   Only where the FBA and BIP are sufficiently flawed so as to render the IEP inadequate to

21   address the child's behaviors will they be adequate to support a finding that the district denied

22   FAPE. See id.; Z.B. v. D.C., 888 F.3d 515, 524 (D.C. Cir. 2018). Here, the Court finds

23   inadequate evidence that the FBA or BIP were flawed in such a way as to render the IEP

24

1    inadequate. The ALJ therefore erred in finding the District denied P.H. FAPE based on her

2    unsubstantiated concerns about the FBA and BIP, and where she found the IEP in force to have

3    met the requirements of the IDEA.

4          On this issue the Court GRANTS the District's appeal and REVERSES the ALJ's

5    conclusion.

6    **F.     P.H.'s Least Restrictive Environment Did Not Require Private Placement**

7          The District argues the ALJ erred in concluding P.H.'s least restrictive environment

8    ("LRE") at the end of the 2022 school year required residential placement. The Court agrees with

9    the District.

10         The IDEA requires, "to the maximum extent appropriate," that a child with disabilities be

11   educated with children who are not disabled, and that special classes or removal of the child

12   occur "only when the nature or severity of the disability of a child is such that education in

13   regular classes with the use of supplementary aids and services cannot be achieved

14   satisfactorily." 20 U.S.C. § 1412(a)(5)(A). This is considered the "least restrictive environment"

15   or LRE. Id. Placement decisions regarding the student are to be made by a group of persons,

16   including the parents and those knowledgeable about the child, the "meaning of the evaluation

17   data," and placement options. 34 C.F.R. § 300.116(a). The placement is to be determined at least

18   annually, based on the child's IEP, and be as close as possible to the child's home. 34 C.F.R. §

19   300.116(b); WAC 392-172A-02060. In some cases, a general education environment may not be

20   an appropriate placement for a child due to the nature or severity of the disability. See 34 C.F.R.

21   § 300.114(a)(2)(ii). In such a case, the IDEA might require placement of the child in a private

22   school with full funding by the public-school district. Sch. Comm. of Burlington v. Dep't of

23   Educ., 471 U.S. 359, 369 (1985). The Ninth Circuit has adopted a four factor balancing test to

24

1    determine whether a school district complied with the LRE environment. <u>Sacramento City</u>

2    <u>Unified Sch. Dist. v. Rachel H.</u>, 14 F.3d 1398, 1404 (9th Cir. 1994). The factors are: "(1) the

3    educational benefits of placement full-time in a regular class; (2) the non-academic benefits of

4    such placement; (3) the effect [the student] had on the teacher and children in the regular class;

5    and (4) the costs of mainstreaming [the student]." <u>Id.</u>

6         The ALJ concluded that although P.H. should not have been placed in a residential

7    facility in late March 2022, by the end of the school year the need for residential placement was

8    "quite clear" given P.H.'s school-refusal behavior and isolation from peers. (ALJ Concl. ¶¶ 63-

9    64.) The Court finds several flaws in this conclusion.

10        First, the ALJ undertook no evaluation of the four factors set forth in <u>Rachel H</u>. 14 F.3d

11   at 1404. This alone is a basis for finding reversible error. And the Court's separate consideration

12   of the four factors shows that they weigh against private placement. The record here shows that

13   there were both academic and non-academic benefits to P.H.'s attendance at his local school.

14   When P.H. attended school, he made progress on his IEP goals, had two friends in the school and

15   interacted with students in a general education class as well as in his special education class.

16   These two factors weigh in favor of an in-district placement. Additionally, the cost of keeping

17   P.H. within the district appear minimal compared to the cost of the residential placement at

18   Shrub Oak. This, too, favors his LRE at the District. The only factor that weighs mildly against

19   in-district placement was P.H.'s disruptive behavior in the regular classroom. P.H. did exhibit

20   disruptive behaviors that interrupted the general education class. But the record does not

21   demonstrate that this was a frequent occurrence. And the ALJ herself concluded that up until the

22   end of the 2021-22 school year, the appropriate placement was within the district. The <u>Rachel H.</u>

23   factors thus disfavor private placement, and support reversal of the ALJ's conclusion. In

24

1  reaching this conclusion, the Court recognizes that one of the key factors animating the ALJ's

2  decision was P.H.'s refusal to attend school. But the mere fact that P.H. engaged in school-

3  refusal behavior was not a valid reason to avoid an analysis under <u>Rachel H.</u>

4        The Court also finds the ALJ's placed too great a reliance on <u>Seattle Sch. Dist., No. 1 v.</u>

5  <u>B.S.</u>, 82 F.3d 1493 (9th Cir. 1996) to support her decision. (See ALJ Concl. ¶ 63.) While there

6  are some parallels between this case and <u>B.S.</u>, the record here does not support a finding that

7  P.H.'s school refusal behavior required private placement. In <u>B.S.</u>, the student was found to

8  require intensive, round-the clock care to address behavioral disabilities that prevented her from

9  accessing her education. <u>B.S.</u>, 82 F.3d at 1501. The student had also been expelled for six

10 months during which she received no educational support, despite her request for tutoring. <u>Id.</u> at

11 1498. While the facts in <u>B.S.</u> supported the need for a private placement, the facts here do not.

12 P.H.'s school-refusal behavior was substantial, but it did not reach the severity that required

13 round-the-clock care in <u>B.S.</u> Moreover, the District here timely developed a plan to address

14 P.H.'s school refusal behaviors that could have enabled P.H. to access the educational services

15 within the District and Parents did not allow for the plan to be tested and applied before

16 unilaterally placing P.H. at Shrub Oak. And though P.H. refused to attend school for the majority

17 of the four months between March and June 2022, the District was attempting to reengage him

18 and needed time to make that happen. This is far afield of <u>B.S.</u>, where the district refused to

19 provide any services after expelling the student. Moreover, some of the delay here in formulating

20 the FBA and BIP for P.H. resulted from the Parents' failure to provide consent to the FBA until

21 the end of March. After the consent was given, Bascom promptly began conducting the FBA in

22 the span of about a month and once the BIP was completed, the District implemented it at the

23 end of May and had less than a month roll it out before the end of school. By the time P.H.

24

became more entrenched in school refusal, there was not an adequate period to determine whether the District's intervention strategies would have worked. This differs from B.S., where the district there came up with no timely plan to provide educational services and the district proposed no viable plan to allow for in-district education given the severity of the student's disability. These facts render B.S. distinguishable, and the Court finds the ALJ's reliance on B.S. inappropriate.

The Court here finds the ALJ erred in determining that P.H.'s LRE was at a private placement by the end of the 2022 school year. The record does not support this determination and the ALJ failed to engage in a thorough analysis of the Rachel H. factors, which weigh against private placement. The Court GRANTS the District's appeal on this issue and REVERSES the ALJ's conclusion on this issue.

**G.      The ALJ Erred in Awarding the Parents' Remedies**

The Court agrees with the District that the ALJ's erred in awarding Parents reimbursement for P.H.'s private placement and related expenses.

Parents who have unilaterally placed their child in a private school are entitled to reimbursement only if a court concludes "(1) that the public placement violated the IDEA, and (2) the private school placement was proper under the IDEA." C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist., 635 F.3d 1155, 1159 (9th Cir. 2011) (internal citation omitted). "If either criteria [sic] is not met, the parent or guardian may not obtain reimbursement." Id. (internal citation omitted). "If both criteria are satisfied, the district court then must exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether, and how much, reimbursement is appropriate." Id. (internal citation omitted).

The Court finds an award of reimbursement improper because the Court concludes that the ALJ erred in finding the unilateral private placement was appropriate. There is inadequate evidence that P.H.'s public placement violated the IDEA. This makes an award of reimbursement inappropriate. Even if the Court found a violation of the IDEA, the Court does not find the equities favor an award of reimbursement for all private-placement related fees. Parents here acted abruptly to unilaterally place P.H. at Shrub Oak without giving the District sufficient time to implement plans to address P.H.'s school refusal. And without any input from the District to consider alternatives, they selected Shrub Oak, which carries with it an annual tuition of $533,695.00. While the Court does not fault Parents for wanting the best for their child, it finds an absence of evidence in the record to support a finding that Shrub Oak represents the proper placement for P.H. and that an award for all tuition and related expenses claims would be appropriate even if there had been a FAPE denial. As such, the Court GRANTS the District's appeal on this issue and REVERSES the ALJ's award of reimbursement.

Additionally, to the extent the ALJ based an award of reimbursement on the denial of FAPE stemming from the FBA and BIP, the Court finds that such an award is improper because the ALJ's findings were erroneous. Given the Court's determination that the FBA and BIP did not result in the denial of FAPE, the Court finds that no award of reimbursement is proper.

## CONCLUSION

Having considered the lengthy administrative record and the sprawling arguments of both Parties, the Court finds several errors which require reversal of the ALJ's decision in favor of the District. First, the ALJ erred in finding a denial of FAPE in 2022. Second, the ALJ erred in concluding that P.H.'s least restrictive environment at the end of the 2021-2022 school year was in a private placement. Third, the ALJ erred in awarding reimbursement to Parents. The Court

therefore GRANTS the District's counterclaim and DENIES Plaintiffs' claim for attorneys' fees.

The Court directs entry of separate judgment in the District's favor on its counterclaim.

   The clerk is ordered to provide copies of this order to all counsel.

   Dated March 1, 2024.

Marsha J. Pechman
United States Senior District Judge